**James E. COX and Christine D. Cox,
Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**No. C–72–1100–CBR.**

United States District Court,
N. D. California.

Dec. 18, 1973.

Robert E. Zang, Zang, Friedman & Damir, San Francisco, Cal., for plaintiffs.

James L. Browning, Jr., Richard J. Sideman, U. S. Attys., San Francisco, Cal., for defendant.

## MEMORANDUM OF OPINION, ORDER AND JUDGMENT

RENFREW, District Judge.

Plaintiff taxpayers purchased certain real property for a long-term investment. After this purchase, an oil field was discovered under the property, but a subsequent underground intrusion of salt water into the oil-bearing strata caused an oil well on the property permanently to cease oil production. The intrusion of salt water did not cause any damage to the surface of the land, it did not interfere in any way with the original purposes for which the real property was purchased, nor did taxpayers suffer any out-of-pocket expenses in connection with the discovery, production or loss of oil on their property.

This case presents a question of first impression, namely, whether under such circumstances, taxpayers may deduct as a casualty loss [1] the decline in the appreciated value of the real property attributed to this underground intrusion. Under these facts, which are more fully set forth below, the Court grants the government's motion for summary judgment.

In June of 1965 plaintiffs [2] and others purchased for $250,000 approximately 80 acres near Livermore, California, for a long-term investment. They contemplated holding the land for possibly ten years and then selling it at a profit. At the time of the purchase plaintiffs were unaware of any underlying minerals on the property. There had been no prior oil exploration on the property, nor had there been any mineral development within a five-mile radius.

On November 11, 1966, plaintiff James E. Cox, as operating partner for the purchasers, signed a lease [3] permitting an oil company to explore for and develop any oil on the property. Other landowners in the area signed similar leases.

In January, 1967, a successful well was drilled on land adjacent to taxpayers' property. More wells were subsequently drilled on the same land. Then in May, 1967, the Smith No. 1 well on taxpayers' land began to produce high quality oil at a rate of 250 barrels per day. A second well (Smith No. 2) was drilled but failed to produce any oil.

---

1. 26 U.S.C. § 165(a) and (c)(3) provide:
   "(a) There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
    *  *  *  *  *
   "(c) In the case of an individual, the deduction under subsection (a) shall be limited to—
    *  *  *  *  *
   "(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. * * *"

2. While the grant deed named only plaintiff James E. Cox as one of the purchasers, plaintiffs' answers to interrogatories state that both plaintiffs purchased the real property. See answers to Government Interrogatories Nos. 7 and 9.

3. The lease provided that the owners would receive $5 per acre and one sixth of the royalty income. The oil company was to assume all development costs and receive five sixths of the royalties.

Less than a month after it began, production at Smith No. 1 had to be closed down. A massive intrusion of underground salt water invaded the oil-bearing strata beneath taxpayer's land flooding the oil producing zones. Although salt water is often found in productive oil fields, the intrusion here was unlike the seepage that normally occurs because it could not be controlled. The intrusion was local in nature in that none of the neighboring wells were affected.

The discovery of oil substantially increased the value of taxpayers' land. Its value declined, however, as a result of the salt water intrusion. It is this decline, representing a portion of the appreciation over the original purchase price, which is claimed to be a casualty loss under § 165(c)(3) of the Internal Revenue Code of 1954. 26 U.S.C. § 165(c)(3).

Plaintiffs filed their joint federal income tax return for 1967 claiming a deduction of $149,900 [4] against gross income for the casualty mentioned above. After audit the deduction was denied and a deficiency assessed. Taxpayers paid the deficiency, filed a claim for refund, and after six months of no response brought this action under 28 U.S.C. § 1346(a)(1).

The instant action was timely filed. This Court has venue and jurisdiction.

The government moved for summary judgment, and for the purposes of this motion only,[5] the parties have agreed to the following facts:

By January 1, 1967, after initial oil exploration and discussions had begun, the land value rose to $500,000.

When the well on plaintiffs' property (Smith No. 1) began to produce, the fair market value rose to $750,000 to $800,000.

After Smith No. 1 production terminated, the land value declined to $400,000.

The salt water intrusion was sudden, unusual and wholly unexpected.[6]

Despite extensive research by counsel, no applicable authorities have been cited, nor has independent research disclosed any.

The government has placed primary reliance upon Jones v. Smith, 193 F.2d 381 (10 Cir. 1951), cert. denied, 343 U.S. 952, 72 S.Ct. 1046, 96 L.Ed. 1353 (1952). While that decision may be said to point the way to the result here, it is not controlling because of the difference in the underlying facts. In *Jones*, the taxpayer, a co-partner in a well drilling company, had to abandon a partially completed oil well in November, 1944, because of a cave-in. The well was then drilled at a new location 100 feet from the abandoned site and was completed early in 1945. The company kept a separate account on its books for each drilling contract. The taxpayer attempted to deduct the drilling costs of the abandoned well in the tax year 1944, rather than in 1945 when the well was finally completed. The deduction was disallowed, a deficiency assessed, and litigation ensued. The district court held for the taxpayer on the ground that the transaction was complete when the first well was abandoned. The drilling of the second well was a new contract. 94 F. Supp. 686, 687 (W.D.Okla.1951). In a

4. The total loss claimed was $150,000, or 60% of the total basis loss of $250,000 (since taxpayers owned a 60% share of the property). The first $100 of such loss is nondeductible under § 165(c)(3).

5. The government expressly reserved the right to offer contrary evidence at trial if this motion were to be denied.

6. It is understandable that the government would stipulate to these facts in order to avoid a lengthy trial on the merits if possible. It must be noted, however, that oil exploration and development is a particularly speculative and risky industry, as evidenced by the already favorable treatment afforded it by the tax code, for example, the oil depletion provisions. Thus the application of the casualty loss provision in cases involving that industry will generally turn on a factual determination of the sudden and unexpected nature of the claimed loss. This opinion should not be construed in any way as a finding by this Court that the salt water intrusion at issue here was, in fact, sudden, unusual or wholly unexpected.

one-sentence dictum the district court stated that the Tax Commissioner's contention that there was no casualty loss was "erroneous." 94 F.Supp. at 687. The Court of Appeals reversed, holding that there was but a single contract for the drilling of an oil well which was not completed until 1945, and under the tax-payer's normal accounting practice the loss must be taken at that time. The court added, also in dicta, that the casualty loss section was not applicable. It first pointed out that cave-ins were not within the literal language of the statute and then noted that, while a loss from a cave-in may be infrequent, "a loss of that kind is not of such extraordinary occurrence that it may appropriately be catalogued as a casualty within the intent and meaning of the statute and the regulation. Instead, such a loss is an incident which may arise in the drilling of deep wells of that kind." 193 F.2d at 384.

The government reads *Jones* as establishing a rule of law that losses incurred in connection with oil well drilling cannot be casualty losses, whether the loss was caused by a cave-in or salt water intrusion. The case does not support such a broad proposition. Its holding is based upon the construction of a contract and the taxpayer's accounting practices. While its result points to the correct direction, the rationale of its dicta, quoted above, is inapposite since here it is stipulated that the salt water intrusion was sudden, unusual and wholly unexpected.

Nor are the cases cited by the government, holding that mere fluctuations in land value do not give rise to deductible casualty losses, helpful. See Pulvers v. C.I.R., 407 F.2d 838 (9 Cir. 1969); Squirt Company v. C.I.R., 423 F.2d 710 (9 Cir. 1970). These cases only hold that the threat of a future injury which causes a present decline in value is not deductible under § 165(c)(3). In the instant case there was an actual injury to the underlying mineral rights which caused a decline in the value of the real property. It was more than a threat.

Likewise, the authorities cited by the very able counsel for taxpayers do not assist the Court. Generally they involved either physical injury to the surface of the land, impairment of potential uses of the surface, loss of egress and ingress, or actual expenditures made for repairs. In any event, in all of the cases there was a loss in value of the real property caused by some accident, which accident might be said to have an impact upon the ability of the taxpayer to pay his federal income taxes.

■ In the absence of controlling authority, the Court turns to a consideration of Congressional intent. As the Supreme Court noted in Perry v. Commerce Loan Co., 383 U.S. 392, 400, 86 S. Ct. 852, 857, 15 L.Ed.2d 827 (1966), rehearing denied, 384 U.S. 934, 86 S.Ct. 1441, 16 L.Ed.2d 535 (quoting United States v. American Trucking Assns., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)):

" 'There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words.' "

A literal reading of § 165(c)(3) is not of assistance here since salt water intrusions are not included within the plain words of the section. Moreover, even if a literal reading of § 165(c)(3) suggested the application of that section to the salt water intrusion here, the Court must nevertheless construe the language

of that section so as to give effect to the clear policy underlying this deduction and to avoid a result which is unreasonable and " 'plainly at variance with the policy of the legislation as a whole.' "

■ In enacting the casualty loss deduction Congress recognized that some purely fortuitous events might so impair a taxpayer's financial position as to make it difficult for him to pay current income taxes. This intent was most recently voiced in 1964 when, in the Revenue Act of 1964, § 165(c)(3) of the Code (26 U.S.C. § 165(c)(3)) was amended to make the first $100 of a personal casualty or theft loss nondeductible. Setting forth the reasons for this provision, the House Committee on Ways and Means explained:

> "Your committee believes that in the case of nonbusiness casualty and theft losses, it is appropriate in computing taxable income to allow the deduction only of those losses which may be considered extraordinary, nonrecurring losses, and which go beyond the average or usual losses incurred by most taxpayers in day-to-day living. In view of this, your committee believes that it is appropriate to limit the casualty loss deduction to those losses or thefts above a minimum amount. The minimum selected by your committee was $100 per casualty loss, since this corresponds approximately with the '$100 deductible' insurance carried by many individuals in the United States with respect to such losses. This means that no deduction will be allowed in the case of an ordinary 'fender bending' accident or casualty, but that casualty and theft losses will continue to be deductible (over the $100) in those cases *where they are sufficient in size to have a significant effect upon an individual's ability to pay Federal income taxes.*" H.Rept. No. 749, 88th Cong.,

1st Sess. (1963), Section IV(B)(8)(b), appearing in Internal Revenue Acts, Beginning 1961, 1275, 1322 (West 1966) (emphasis supplied by the Court).[7]

This concern for current tax-paying ability is evinced by this exclusion of losses of less than $100, i. e., losses which in Congress' view generally would not impair tax-paying ability. In addition, since losses which are compensated for by insurance or otherwise do not impair current tax-paying ability, they also are nondeductible under 26 U.S.C. § 165(a).

■ Here the plaintiff taxpayers have not had their ability to pay income taxes impaired in any way. They have suffered no loss affecting their cash flow. They need not make any expenditure in order to realize the original goal of their investment, namely, the long-term appreciation of the real property itself which the taxpayers expected to occur as a result of the general development of the Livermore area. The most that taxpayers here could be said to have suffered was the loss of a portion of an unexpected and unrealized appreciation collateral to their original investment. One of the fundamental purposes of this deduction was to minimize the financial hardships of extraordinary losses; it was not intended to be a device for obtaining windfalls.

It may also be inferred that by giving tax relief in such cases Congress intended to encourage taxpayers to make repairs or replacement which would have the effect not only of improving the real property but also of increasing its basis. Here, of course, no repairs could be made, and thus this purpose for the deduction cannot be served in circumstances such as those now before the Court.

■ Were taxpayers to succeed here, they would have, in effect, used

---

7. The Senate Finance Committee agreed with the House Committee's discussion of the reasons for this provision. S.Rept.No.830, 88th Cong., 2d Sess. (1964), Section IV(b)(8)(b), appearing in Internal Revenue Acts, Beginning 1961, 1635, 1692 (1966).

the casualty loss provision to convert $149,900 of ordinary income into capital gains, thus obtaining the significant benefit of the lower tax rate for such gains. The casualty loss section was never intended to provide a tax shelter for ordinary income under the present circumstances. In the oil depletion allowance, the deductions for exploration expenses, etc., Congress has provided specific tax relief for the risks inherent in the oil industry. In the instant case the casualty loss provision must be construed against the background of these specific relief provisions. It must always be remembered that deductions are a matter of legislative grace, and the taxpayer must bring himself within the appropriate statutory authorization to be entitled to a deduction. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). Here taxpayers have failed to do so. The absence of any injury to the surface of the land, of any impairment to the potential surface uses, of any out-of-pocket expenditures by the taxpayers, of any impairment in their ability to pay federal income taxes, and the very significant appreciation in the real property even after the salt water intrusion, all support the conclusion that Congress did not intend a casualty loss deduction under these circumstances.

Accordingly,

It is hereby ordered, adjudged and decreed that defendant's motion for summary judgment is granted.

It is hereby further ordered, adjudged and decreed that the complaint herein is dismissed.

It is hereby further ordered, adjudged and decreed that judgment be entered in favor of the United States of Amercia.

It is hereby further ordered, adjudged and decreed that the United States of America recover its costs incurred herein.